## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **LOCAL 464A UNITED FOOD AND COMMERCIAL WORKERS UNION WELFARE SERVICE BENEFIT FUND, on behalf of itself and all others similarly situated,** | **Case No. _____** |
| **Plaintiff,** | **CLASS ACTION COMPLAINT** |
| | **DEMAND FOR JURY TRIAL** |
| **v.** | |
| **REGENERON PHARMACEUTICALS, INC.,** | |
| **Defendant.** | |

# TABLE OF CONTENTS

I.      INTRODUCTION ............................................................................................................ 1

II.     JURISDICTION AND VENUE ................................................................................... 3

III.    PARTIES ......................................................................................................................... 4

IV.     FACTS ............................................................................................................................. 5

        A.     Neovascular (Wet) Age-Related Macular Degeneration ............................ 5

        B.     Eylea and Alternative Treatments for Wet AMD ...................................... 5

        C.     Health Benefit Plan Cost Sharing ............................................................. 8

        D.     Medicare Advantage and Part D Plans ..................................................... 9

        E.     The Federal Anti-Kickback Statute ......................................................... 10

        F.     Regeneron's Scheme to Defraud Healthcare Plans and Sponsors ......... 13

               1.     The Chronic Disease Fund ........................................................ 14

               2.     Regeneron Violated the Anti-Kickback Statute ...................... 14

               3.     Regeneron Induced Physicians to Prescribe Eylea and Facilitated Plaintiff
                      and Class Members' Overpayments ........................................ 23

               4.     Regeneron Actively Concealed its Scheme .............................. 27

V.      PLAINTIFF'S AND THE CLASS'S DAMAGES ................................................... 30

VI.     TOLLING ...................................................................................................................... 31

VII.    CLASS ACTION ALLEGATIONS ........................................................................... 31

VIII.   CLAIMS FOR RELIEF ............................................................................................... 34

IX.     DEMAND FOR JUDGMENT .................................................................................... 50

X.      JURY DEMAND .......................................................................................................... 50

Plaintiff Local 464A United Food and Commercial Workers Union Welfare Service Benefit Fund ("Plaintiff" or "UFCW Local 464A") brings this action on behalf of itself and all others similarly situated and alleges the following against Regeneron Pharmaceuticals, Inc. ("Regeneron" or "Defendant"). These allegations are based on investigations of counsel, publicly available materials and knowledge, information, and belief.

## I.    INTRODUCTION

1.    This case arises from Regeneron's unlawful scheme to utilize a system of kickbacks to patients to circumvent healthcare plans' incentive structures to secure increased sales, at inflated prices, for its blockbuster drug Eylea.

2.    Regeneron manufactures and sells Eylea (aflibercept), a prescription drug administered by injection for the treatment of an eye condition known as wet age-related macular degeneration ("wet AMD") that can render patients legally blind.

3.    From 2012 to at least June 2020, Eylea's wholesale list price was $1,850 per dose, resulting in costs of over $10,000 for a single year of treatment.

4.    Eylea generates billions of dollars of sales in the United States despite the fact that an alternative with similar efficacy, Avastin, is available for only 3% of Eylea's cost.

5.    Regeneron has maintained Eylea's market dominance through a kickback scheme designed to negate patients' and physicians' cost sensitivity, which would ordinarily drive them to seek out the lowest-cost effective treatment.

6.    Since 2012, Regeneron regularly funneled funds disguised as donations to the Chronic Disease Fund, Inc. ("CDF"), a purported charity. These funds were specifically earmarked for use to pay cost-sharing obligations for Eylea patients. This arrangement meant that patients could obtain Eylea at little to no cost. However, the arrangement also caused patients'

health benefit plans and plan sponsors to pay for Eylea prescriptions that never would have been written absent Regeneron's scheme.

7.     Regeneron widely advertised to patients and physicians the availability of CDF's financial assistance for Eylea cost-sharing obligations.   Regeneron promoted this assistance through a program called "EYLEA4U," which Regeneron implemented in concert with CDF and The Lash Group LLC (the "Lash Group"), a pharmaceutical industry consulting firm.   The EYLEA4U program connected patients and prescribers with CDF, assisted them in submitting claims to healthcare plans such as Plaintiff, and facilitated the plans' payment of invalid claims tainted by Regeneron's illegal kickbacks.

8.     Regeneron's scheme was intended to maximize Regeneron's profits.

9.     Regeneron concealed its illegal scheme from the public, including Plaintiff and other payors who paid some or all of the cost of Eylea prescriptions, until the scheme was exposed in June 2020, when the U.S. Department of Justice filed an action against Regeneron for violations of the False Claims Act, (the "DOJ Action").   *United States v. Regeneron Pharms, Inc*., No. 20-CV-11217-FDS (D. Mass.).

10.     Regeneron's scheme harmed Plaintiff in several ways.   Claims submitted to Plaintiff for Eylea, which were related to violations of the federal Anti-Kickback Statute, were fraudulently presented to Plaintiff as valid, payable claims.   Because Regeneron concealed its illegal kickbacks, Plaintiff was defrauded into paying these illicit claims.

11.     Further, Regeneron's scheme circumvented provisions in Plaintiff's health benefit plans that required beneficiaries to pay a share of the cost of prescription drugs.   Because Regeneron had paid these beneficiaries' cost-sharing obligations and concealed the fact that it did

so from Plaintiff, Plaintiff paid claims for which beneficiaries had not satisfied the cost-sharing terms of their plans.

12.     Regeneron's scheme was extremely successful at Plaintiff and Class members' expense.  Even with Eylea's sky-high costs and the availability of an effective alternative, Eylea has become the best-selling drug for treating wet AMD in the United States.  In 2021, Eylea reached over $5 billion in sales.

13.     Plaintiff brings this action under the federal Racketeer Influenced and Corrupt Organizations ("RICO") Act, state unfair and deceptive trade practice statutes, and state laws governing fraudulent concealment, tortious interference with contractual relationships, and unjust enrichment.

## II.    JURISDICTION AND VENUE

14.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the federal laws of the United States.  Specifically, Plaintiff asserts claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962, *et seq*.

15.     This Court also has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367(a).  Plaintiff's state law claims are so related to its federal claims that they form part of the same case or controversy.

16.     In addition, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiff and Regeneron, and the amount in controversy exceeds $75,000.

17.     This Court has personal jurisdiction over Regeneron.  At all relevant times, Regeneron transacted business in this District; marketed and sold Eylea in this District; to

customers located in this District; and made payments to cover the cost-sharing obligations of Eylea patients located in this District.

18.     Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims in this action have occurred in this District.  Regeneron paid for the cost-sharing obligations of a substantial number of patients located in Massachusetts.

## III.    PARTIES

19.     Plaintiff UFCW Local 464A is headquartered, with its principal place of business, in Little Falls, New Jersey.  UFCW Local 464A is a joint labor-management sponsored trust fund authorized by Sections 302(c)(5) and (8) of the Labor Relations Management Act, established to provide health and welfare benefits to employees and their families, commonly known as a Taft-Hartley Fund, as well as an employee welfare benefit fund within the meaning of Section 3(1) of the Employee Retirement Income Security Act, that provides a program of health, welfare, legal, and related benefits for its participants and beneficiaries.  UCFW Local 464A purchased and/or provided reimbursement for some or all of the purchase price for Eylea prescriptions that would not otherwise have been written, at inflated prices, during the Class Period and has therefore been injured.  In addition, there is a substantial probability that UFCW Local 464A will in the future purchase and/or provide reimbursement for Eylea manufactured by Regeneron.  UFCW Local 464A paid and reimbursed for Eylea more frequently and at higher prices than it would have absent Regeneron's unlawful conduct.  Plaintiff brings these claims on behalf of itself and all others similarly situated.

20.     Defendant Regeneron Pharmaceuticals, Inc. ("Regeneron") is a pharmaceutical company incorporated in New York with its principal place of business at 777 Old Saw Mill River Road, Tarrytown, New York 10591.

## IV.    FACTS

### A.    Neovascular (Wet) Age-Related Macular Degeneration

21.    Wet AMD is a chronic eye disorder that causes blurred vision or blind spots in the visual field.  Wet AMD typically is a major cause of progressive vision loss, especially in patients over 50.  It is the most common cause of severe loss of vision.

22.    Wet AMD occurs when the overproduction of a naturally-occurring protein called vascular endothelial growth factor ("VEGF") encourages the growth of abnormal blood vessels under the retina.

23.    Wet AMD is treated by regularly injecting anti-VEGF agents into the eye.

### B.    Eylea and Alternative Treatments for Wet AMD

24.    The U.S. Food and Drug Administration ("FDA") approved Eylea as a treatment for wet AMD in 2011.  Eylea is an injectable anti-VEGF drug manufactured and sold by Regeneron.  Eylea is administered in physicians' offices to patients.

25.    It is generally recommended that patients receive a 2 mg dose of Eylea monthly for the first year of treatment, followed by six to seven doses per year thereafter.  At all relevant times, the wholesale acquisition cost of Eylea was $1,850 per dose.  At this price, Eylea costs well in excess of $10,000 per year for each patient.

26.    Eylea is a key product in Regeneron's portfolio, generating over $5 billion in sales in the United States annually.

27.    Since 2012, Eylea has generated over $31.5 billion in sales for Regeneron.

28.    In 2021, Eylea was Regeneron's second highest-grossing product, second only to REGEN-COV, its monoclonal antibody treatment for COVID-19.  In 2019, prior to the COVID-19 pandemic, Eylea accounted for over 66% of Regeneron's United States sales revenue, accounting for over $4.6 billion in sales.

29.     In its annual report filing for fiscal year 2013 ("2013 Annual Report"), Regeneron warned investors that "EYLEA net sales represent a substantial portion of our revenues and this concentration of our net sales in a single product makes us substantially dependent on that product," cautioning that difficulties commercializing Eylea would materially harm the company.[1]

30.     The 2013 Annual Report also revealed that Eylea sales depended on reimbursement from third party payors like Plaintiff: "Since EYLEA is too expensive for most patients to afford without health insurance coverage, if adequate coverage and reimbursement by third-party payers, including Medicare and Medicaid in the United States, is not available, our ability to successfully commercialize EYLEA will be materially adversely impacted."[2]

31.     Lucentis and Avastin, both anti-VEGF injectable drugs, are Eylea's primary competitors.  Both Lucentis and Avastin are sold by Genentech, Inc. Lucentis was approved by the FDA to treat wet AMD in 2006.  It is priced at approximately $2,000 per dose.

32.     Avastin was approved by the FDA in 2004 to treat certain cancers.  Avastin is chemically similar to Lucentis, however Avastin has not received FDA approval for the treatment of wet AMD.  Multiple studies have shown that Avastin has comparable efficacy to Lucentis and Eylea in the treatment of wet AMD.[3]

33.     Because Lucentis and Eylea have significantly higher list prices than Avastin, physicians sometimes substitute Avastin for the higher-priced drugs, particularly when prescribing

---

[1] Regeneron Pharmaceuticals, Inc., Form 10-K filed Feb. 13, 2014, at 20.

[2] *Id*. at 22.

[3] *See* National Eye Institute, *Avastin as Effective as Eylea for Treating Central Retinal Vein Occlusion*, (May 9, 2017), https://www.nei.nih.gov/about/news-and-events/news/avastin-effective-eylea-treating-central-retinal-vein-occlusion; National Institutes of Health, *Avastin and Lucentis Are Equivalent in Treating Age-Related Macular Degeneration* (Apr. 30, 2012), https://www.nih.gov/news-events/news-releases/avastin-lucentis-are-equivalent-treating-age-related-macular-degeneration.

Lucentis or Eylea would result in a high cost to the patient.  When Avastin is used off-label to treat wet AMD, it costs approximately $55 per dose.

34.     Doctors have shown a willingness to choose Avastin over Eylea when financial incentives become a significant consideration.  For example, a Regeneron executive testified in December 2020 that a decrease in the Medicare reimbursement rate for Eylea gave doctors a strong incentive "to switch patients from EYLEA to off-label Avastin."  He also testified that "at least some patients who were switched from EYLEA to off-label Avastin (or other drugs) would be unlikely to return to EYLEA."  *Regeneron Pharms., Inc. v. U.S. Dep't of Health & Human Servs.*, No. 7:20-cv-10488-KMK, ECF No. 13 ¶¶ 24, 26 (S.D.N.Y. Dec. 11, 2020).

35.     The 2013 Annual Report recognized that Avastin posed a "significant competitive challenge" to Eylea due to physicians' success with using Avastin to treat wet AMD and Avastin's "relatively low cost."[4]

36.     Healthcare co-pay foundations frequently provide patient assistance to wet AMD patients who have been prescribed Eylea and Lucentis, but not Avastin.  Consequently, the patients' share of payments for Eylea and Lucentis is often less than for Avastin.  Despite the savings that this represents for patients, other payors, such as health care providers' offices and health plans, pay significantly more for Eylea and Lucentis than they pay for Avastin.

37.     On information and belief, when health care providers know that cost-sharing assistance is unavailable to patients, they frequently prescribe Avastin to treat wet AMD in order to minimize the amount charged to the patient.

---

[4] *Id*. at 22.

C.      **Health Benefit Plan Cost Sharing**

38.     When an individual acquires health insurance, he or she enrolls in a health benefit plan.  The plan provides terms and conditions as to how healthcare services, drugs, and other items will be paid for by the administrator, and in what amount those items will be paid.

39.     Health benefit plans are designed to sensitize beneficiaries to the costs of the services and drugs they receive.  This is accomplished by requiring beneficiaries to bear a portion of the cost of the medical service, drug, or other expense.  The amounts that benefit plans require beneficiaries to pay are referred to as the beneficiaries' "cost-sharing obligations."  Cost-sharing obligations may be structured as co-pays (fixed payments for certain expenses), coinsurance (percentages of expenses' cost), and deductibles (threshold payments that must be made before payment from the health plan).  Cost-sharing obligations create incentives for beneficiaries to opt for less expensive services and drugs to the extent such options are available.  Even when lower-cost alternatives are not available, cost-sharing obligations apply downward pressure on prices.

40.     Physicians are aware that patients are commonly subject to cost-sharing obligations.  Accordingly, physicians are incentivized to order lower cost treatments and to prescribe lower-cost drugs to the extent possible.

41.     Because cost-sharing obligations sensitize patients and physicians to costs, they limit pharmaceutical companies' ability to charge inflated prices.  When a drug's price is high, patients and prescribers will seek out lower-cost options.

42.     Pharmaceutical companies sometimes pay patients' cost-sharing obligations themselves, removing the patients' and physicians' cost sensitivity from their decision making process.  This allows the pharmaceutical companies to build and maintain patient bases and even to inflate prices with less worry about a reduction in sales.  As a 2014 article published in the *New England Journal of Medicine* explained:

> Assistance programs are a triple boon for manufacturers. They increase demand, allow companies to charge higher prices, and provide public-relations benefits. Assistance programs are an especially attractive proposition for firms that sell particularly costly drugs. Faced with high out-of-pocket costs, some patients may decide against taking an expensive medication. Patient-assistance programs can convert such patients from nonusers to users.[5]

43.     When pharmaceutical companies pay patients' cost-sharing obligations, healthcare payors, including plan sponsors as well as the federal government, shoulder the majority of the inflated prices that are charged.

44.     In this case, Regeneron carried out a scheme specifically designed to circumvent the cost-sharing obligations and incentive structure that patients' health plans had put into place. When Regeneron paid patient cost-sharing obligations for Eylea through CDF, Eylea was viewed as affordable or even free in the eyes of patients and their physicians, leading them to select Eylea even over the much lower-cost Avastin, which had demonstrated similar effectiveness. Meanwhile, payors, including Plaintiff and Class members, still bore the sky-high cost of Eylea even though patients did not.

### D.     Medicare Advantage and Part D Plans

45.     The federal government administers Medicare Parts A and B through the Centers for Medicare and Medicaid Services ("CMS").

46.     Medicare Part A applies to inpatient hospital services as well as skilled nursing services and certain types of home-based care.

---

[5] David H. Howard, *Drug Companies' Patient-Assistance Programs—Helping Patients or Profits?*, NEW ENGLAND JOURNAL OF MEDICINE (2014).

47.     Medicare Part B applies to physician services, outpatient hospital services, diagnostics, and other medical services.  Both Parts A and B include drug coverage under certain circumstances.

48.     Medicare patients may be eligible to enroll in Medicare Part C, or "Medicare Advantage."  Medicare Advantage offers the same benefits as Parts A and B, and it also includes outpatient prescription drug coverage.  Medicare Advantage plans are made available through private healthcare companies pursuant to contracts with CMS.

49.     Medicare Advantage plans cover Eylea and similar drugs.

50.     Medicare Part D subsidizes the cost of prescription drugs for certain Medicare beneficiaries.  Medicare Part D is made available through private healthcare companies pursuant to contracts with CMS.

51.     Medicare Part D plans cover Eylea and similar drugs.

52.     Healthcare claims payable by Medicare must comply with applicable federal laws, including the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b).  As a condition of participating in Medicare, healthcare providers must expressly certify compliance with federal law.  When providers submit claims to Medicare payors using the standard form, CMS-1500, they certify that each claim "complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the Federal anti-kickback statute."[6]

E.     **The Federal Anti-Kickback Statute**

53.     The federal Anti-Kickback Statute prohibits "knowingly and willfully offer[ing] or pay[ing] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly

---

[6]  Centers for Medicare and Medicaid Services, CMS-1500, (Sept. 19, 2019), https://www.cms.gov/Regulations-and-Guidance/Legislation/PaperworkReductionActof1995/PRA-Listing-Items/CMS-1500.

or covertly, in cash or in kind to any person to induce such person . . . to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program," including Medicare.  42 U.S.C. § 1320a-7b(b)(2).

54.     The statute defines "remuneration" to include anything of value, including "cash" and "in-kind" payments or rebates.  42 U.S.C. § 1320a-7b(b)(2).  Money and other forms of financial subsidies that can be used to pay or waive Medicare co-pays constitute remuneration under the Anti-Kickback Statute.

55.     Medicare Advantage is a "federal health care program" within the meaning of 42 U.S.C. § 1320a-7b(b)(f).  Consequently, pharmaceutical companies who obtain reimbursement for drugs through Medicare Advantage programs must comply with the federal Anti-Kickback Statute.

56.     The Anti-Kickback Statute also prohibits "knowingly and willfully mak[ing] or caus[ing] to be made any false statement or representation of a material fact in any application for any benefit or payment under a Federal health care program," and "knowingly and willfully mak[ing] or caus[ing] to be made any false statement or representation of a material fact for use in determining rights to such benefit or payment."  42 U.S.C. § 1320a–7b(a)(1) and (2).

57.     It is a violation of the Anti-Kickback Statute for a pharmaceutical company to pay or waive a patient's cost-sharing obligations when the patient is enrolled in a Medicare Part A, B, C, or D plan.

58.     Patient assistance programs, which aid patients in paying the out-of-pocket portion so their healthcare costs, have been an area of concern for regulators enforcing the Anti-Kickback Statute.  In 2005, the U.S. Department of Health and Human Services, Office of Inspector General

("HHS-OIG") issued a bulletin addressing the legality of patient assistance programs, entitled

Special Advisory Bulletin on Patient Assistance Programs for Medicare Part D" (the "Bulletin").

59.     The Bulletin explained that "pharmaceutical manufacturers can donate to *bona fide*

independent charity [patient assistant programs]" where "appropriate safeguards exist," but

cautioned that patient assistance programs funded by drug companies "present heightened risks

under the anti-kickback statute."  70 Fed. Reg. 70,623, 70,624 (Nov. 22, 2005).

60.     The Bulletin further warned that any "independent [patient assistance program]

must not function as a conduit for payments by the pharmaceutical manufacturer to patients and

must not impermissibly influence beneficiaries' drug choices."  *Id.*

61.     The Bulletin specifically addressed how funding cost-sharing can be profitable for

pharmaceutical companies and anticipated the exact scheme in which Regeneron engaged:

> [C]ost-sharing subsidies can be very profitable for manufacturers,
> providing additional incentives for abuse.  So long as the
> manufacturer's sales price for the product exceeds its marginal
> variable costs plus the amount of the cost-sharing assistance, the
> manufacturer makes a profit.  These profits can be considerable,
> especially for expensive drugs for chronic conditions.  ***We are
> concerned that pharmaceutical manufacturers may seek
> improperly to maximize these profits by creating sham
> "independent" charities to operate [patient access programs]; by
> colluding with independent charity programs to ensure that the
> manufacturer's contributions only or primarily benefit patients
> using its products***[.]

*Id*. at 70,626 (emphasis added).

62.     The Bulletin also expressed concern about "the use of cost-sharing subsidies to

shield beneficiaries from the economic effects of drug pricing, thus eliminating a market safeguard

against inflated prices."  *Id*. at 70,626.

63.     In 2014, HHS-OIG reiterated the concerns it had expressed in the Bulletin in a new

document, titled "Supplemental Special Advisory Bulletin: Independent Charity Patient

Assistance Programs" (the "Supplemental Bulletin").  79 Fed. Reg. 31,121 (May 30, 2014).  In

particular, the Supplemental Bulletin specified a "critical safeguard" against violations of the Anti-

Kickback Statute that must be in place to licitly donate to independent charities:

> [The charity] will provide donors only with reports including data
> such as the aggregate number of applicants for assistance, the
> aggregate number of patients qualifying for assistance, and the
> aggregate amount disbursed from the fund during that reporting
> period.  Thus, the charity would not give a donor any information
> that would enable a donor to correlate the amount or frequency of
> its donations with the number of aid recipients who use its products
> or services or the volume of those products supported by the [patient
> assistance plan].

*Id*. at 31,123 (emphasis added).

### F.      Regeneron's Scheme to Defraud Healthcare Plans and Sponsors

64.     Regeneron devised and implemented an unlawful scheme with the aim of

undermining the cost-sharing obligations to which Eylea patients were subject to under their health

benefit plans.  Regeneron did so through concerted action with CDF and the Lash Group, which

jointly operated and participated in the EYLEA4U program.

65.     Since at least 2012, Regeneron has made "donations" to CDF designed to result in

illegal kickbacks to patients to encourage sales of Eylea.

66.     With cooperation from CDF, Regeneron determined the amount of money that was

needed to cover Eylea patients' cost-sharing obligations.  Regeneron "donated" this amount of

money to CDF, and CDF disseminated these funds to patients to relieve them of their cost-sharing

obligations.

67.     Regeneron hired the Lash Group to market the availability of the co-pay relief funds

through EYLEA4U, a program to, *inter alia*, connect patients with CDF, increase Eylea

prescriptions, and facilitate payments from payors for Eylea.

68.     As a result of its unlawful scheme, Regeneron circumvented cost-sharing provisions included in health benefit plans' designs, resulting in sales of Eylea that would not have occurred if patients had borne their co-pay obligations.  The scheme also allowed Regeneron to charge exorbitant, inflated prices for Eylea.  Payors, including Plaintiff and Class members, were forced to pay for a higher volume of Eylea prescriptions, at higher prices, than they would have paid absent Regeneron's illegal scheme.

69.     On June 24, 2020, Regeneron's scheme was revealed to the public when the United States Department of Justice filed an action against Regeneron alleging that Regeneron had violated the federal Anti-Kickback Statute and False Claims Act.  *United States v. Regeneron Pharms., Inc.*, No. 20-cv-11217-FDS (D. Mass.).

### 1.     The Chronic Disease Fund

70.     CDF is a purportedly independent charity that provides funding to patients to help them pay for certain drugs, including Eylea.  CDF now operates as Good Days.  In a typical transaction, a prescribing physician would submit a claim to CDF to cover a patient's cost-sharing obligation for a particular drug.  CDF would pay the claim by drawing on funds that the drug's manufacturer had provided to CDF in the form of grants earmarked for the treatment of the relevant health condition.

71.     On information and belief, since at least 2010, CDF has operated a fund to cover Medicare co-pays for patients taking drugs for AMD.  Prior to Eylea's launch, Genentech was the sole funder of CDF's AMD fund.  After Eylea was launched, CDF's AMD fund issued grants for Lucentis and Eylea, but not for competing drug Avastin.

### 2.     Regeneron Violated the Anti-Kickback Statute

72.     As Regeneron prepared to launch Eylea, it hired Xcenda, a division of AmerisourceBergen Corporation, to conduct an analysis of pricing and reimbursement issues

14

relating to the drug.  Xcenda specifically analyzed how Eylea should be priced, how a free drug program for Eylea could be structured, and how much Regeneron should allocate to foundations to support Eylea.  At the time it hired Xcenda, Regeneron was considering pricing Eylea at $1,500 per dose.

73.    In determining how much money Regeneron should allocate for funding to patient assistance foundations, Xcenda observed that 77% of wet AMD patients were Medicare beneficiaries.  Xcenda projected that Regeneron should give almost $3 million in patient assistance funding to foundations such as CDF to support Eylea in 2012 in order to cover the cost-sharing obligations of Medicare beneficiaries with wet AMD.  *See* Exhibit 1.

74.    Xcenda also noted that increasing Eylea's price to $1,950 per dose from Regeneron's planned price of $1,500 could have a "largely favorable" financial impact for Regeneron.  However, Xcenda explained that the higher price would lead to a higher cost-sharing burden on patients, and that Regeneron would need to allocate an additional 43% in foundation funding, "since the revenue increase will offset the increase in the budget needs to run the program":



75. Xcenda made clear that federal law prohibits manufacturers from coordinating with patient assistance programs in certain ways, including paying the cost-sharing obligation of Medicare patients. Xcenda also noted that using charity donations to fund patient cost-sharing could result in "[u]nknown allocation of funds among products in the same therapeutic space," which could lead to Regeneron inadvertently subsidizing competing drugs. *See id.* Xcenda explained: "Donations to copay charities have several limitations, such as no control over which product is supported, limited data provided by the foundation, and no control over operations of the fund (e.g., income eligibility criteria or spend-down)." *Id.*

76. Xcenda also pointed out that permissible forms of patient assistance, such as "providing free [Eylea]" to needy patients, were not "the most financially viable" options and would in fact be financially disadvantageous to Regeneron. *Id.*

16

77.     After receiving Xcenda's analysis and recommendations, Regeneron decided to price Eylea at $1,850 per dose, 23% higher than the price it had earlier considered.  Regeneron also followed Xcenda's advice regarding limitations on free drug program, choosing to offer free Eylea only to patients without insurance coverage.

78.     Regeneron management understood that, without assistance to subsidize patient cost-sharing obligations for Eylea, doctors would frequently prescribe Avastin instead, because Avastin was significantly less expensive.  As Regeneron Senior Director for Reimbursement Cynthia Sherman explained, "that's why they wanted to have a managed care co-pay program." In its effort to minimize competition from Avastin, Regeneron decided to make "donations" to CDF in order to relieve patients of their cost-sharing obligations.

79.     In 2011, when Eylea launched, Regeneron paid CDF $125,000.  In 2012, the first full year that Eylea was commercially available, Regeneron paid CDF $600,000.  In the DOJ Action, Sherman testified that Regeneron was hesitant to "provide a lot of money the first year because you just didn't know how many--what the uptake of Eylea would be, ***and Regeneron did not want to pay for Lucentis's copay***." (emphasis added).

80.     As Eylea's 2012 sales exceeded Regeneron's pre-launch projections, Regeneron began to consider increasing its contribution to CDF.  Regeneron wanted to ensure that the contributions would be spent on Eylea cost-sharing expenses rather than expenses related to its competitor Lucentis.  On July 9, 2012, Regeneron's Senior Manager for Reimbursement and Managed Markets Marketing, Robert Krukowski, sent an email to William Daniels, his direct report, asking Daniels whether he had spoken with CDF executive Director Clorinda Walley about "upping our contributions for 2013."  Exhibit 2.  Later in July 2013, Walley sent Daniels a spreadsheet entitled "Regeneron Projections 2013," which disclosed CDF's current spending on

Eylea patient assistance and projected the amount CDF would need in 2013 to cover the cost-sharing obligations of Eylea patients.  *See* Exhibit 3.  The spreadsheet stated that CDF's "Total Projected Funding Needed" from Regeneron was just over $40 million.

81.     Daniels next combined the information supplied by CDF with Regeneron's internal data in order to revise CDF's projections downward.  Daniels projected that Regeneron could fund the cost-sharing obligations of existing Eylea patients for approximately $5.6 million and the cost-sharing obligations of new Eylea patients with payments of between $11.5 and $19.2 million. Exhibit 4.  He also projected that funding cost-sharing obligations of existing patients could reap a $24.8 million return on investment.  *Id.*

82.     In August 2012, Daniels prepared a presentation analyzing the risks to Regeneron of an inadequate payment to CDF.  According to the analysis, CDF had warned that "if every donor doesn't cover their market share [for 2013], the fund will be closed."  Exhibit 5.

83.     On August 16, 2012, in advance of a meeting to discuss "CDF Funding," Daniels circulated a presentation that included a projection of millions of dollars of "Potential Lost Revenue" if Regeneron did not pay CDF a contribution large enough to cover the Medicare expenses of potential new Eylea patients who would seek funding from CDF in 2013:

## Discussion

- CDF quoted Regeneron Share of AMD fund ~ 6,200 Patients
  - 2013 New Patients ~ 9,500
- CDF quoted may be closer to actuals as Avastin patients not utilizing fund
- Total Request from CDF
  - $40,019,341
- Potential Lost Revenue if fund were to shut down July 1, 2013 ~ $10,865,790
  - Rollover
    - $4,662,000
      - Assuming 30% of patients don't continue therapy once copay funding is lost * 3 remaining 2013 injections
  - New
    - $8,271,720
      - Assuming 30% of patients don't initiate therapy without copay funding * 3 remaining 2013 injections



Confidential – For Training Purposes Only – Not To Be Copied or Distributed

84.     The meeting for which the presentation was prepared was rescheduled until October 2012.

85.     When the rescheduled meeting occurred on October 8, 2012, management rejected Daniels' assessment and decided to pay CDF only $2.5 million in 2013.

86.     After Daniels conveyed to Walley that Regeneron would pay CDF only $2.5 million in 2013, Walley informed Daniels by email on December 19, 2012 that a $2.5 million contribution would deplete CDF's AMD fund during early in 2013.  *See* Exhibit 6.  Along with her e-mail, Walley attached a revised projection showing that Regeneron would need to donate $24,843,956 to cover cost-sharing obligations for Eylea patients in 2013.  *See id.*

87.     Ultimately, in January 2013, Regeneron agreed to contribute approximately $25 million to CDF.  Daniels informed Walley that he had used the information provided by CDF to demonstrate to Regeneron executives that Regeneron "potentially need[ed] ~25Mil to adequately fund our patient responsibility for 2012."  Exhibit 7.

88.     Although CDF combined the funds received from Regeneron with funds received from other manufacturers, Regeneron understood from its communications with CDF that, at least for purposes of calculating Regeneron's annual funding, the amounts to be paid by Regeneron would match the amounts CDF expected to pay for the cost-sharing obligations of Eylea patients, to the exclusion of patients using alternative drugs.

89.     On information and belief, Regeneron and CDF had an understanding that the aggregate amounts Regeneron contributed to CDF would correlate closely with the amounts CDF would pay to fund cost-sharing obligations for Eylea patients.

90.     During the first half of 2013, Regeneron transferred $12.5 million (half of its promised 2013 payment) to CDF.  However, on June 18, 2013, CDF sent Regeneron updated data in a spreadsheet entitled "Regeneron Projections," indicating that CDF would need to donate $34,540,204 to fully fund Eylea patients' cost-sharing obligations for 2013.  *See* Exhibit 8.

91.     On June 24, 2013, Daniels sent Krukowski a set of "CDF Slides" he had prepared to explain why Regeneron should pay CDF $35 million, rather than $25 million, in 2013.  Relying on the information he had received from CDF, Daniels reported that "CDF has paid out $32.6MM through 6/3/13" and that CDF's "2013 renewals" for Eylea patients accounted for "~41% of Fund." Daniels then presented the return on investment ("ROI")  Regeneron could expect from paying CDF $35 million in 2013:



92.     Shortly thereafter, Regeneron agreed to increase its 2013 contribution to CDF to the $35 million CDF had requested.  Exhibit 9.  The $35 million figure aligned almost exactly with the amount that CDF had indicated to Regeneron it would need to cover patient co-pays in 2013.

93.     On January 3, 2014, Walley provided Daniels with a new request detailing the amount that CDF required to fund cost-sharing obligations for patients using Eylea:

| Please find attached an updated AMD projection need for 2014 which includes CDF's need to facilitate assistance for renewal and new patients in the 1st quarter.  I have summarized below. | |
| --- | --- |
| 2014 Renewals | $ 29,434,885 |
| 2013 Roll-Over | $  9,500,000 |
| Total 2014 ReEnrollment Need | $ 19,934,885 |
| Total 2014 1st Qtr Need | $  5,495,226 |
| Sum of Need Existing/New 1st Qtr 2014 | $ 25,430,111 |

21

94.     The request indicated that CDF expected to spend about $29.5 million to renew grants for Eylea patients who had received grants in 2013 and about $5.5 million to fund grants for patients who would start using Eylea in the first quarter of 2014.  The email also indicated that CDF intended to credit Regeneron for $9.5 million that it had not paid in grants during 2013. Testifying about this request in the DOJ Action, Daniels admitted that he understood it would cover only costs for Eylea.   On January 6, 2014, Daniels emailed Regeneron management recommending that Regeneron pay CDF $25.5 million in the first quarter of 2014.

95.     Because Regeneron's contributions to CDF closely tracked the amounts paid by CDF to Eylea patients, CDF served as a conduit to funnel payments from Regeneron to Eylea patients.

96.     During this period, Regeneron saw clear confirmation that its payments to CDF were necessary to forestall a loss of sales due to price competition from Avastin.  In early 2014, a Regeneron sales associate reported that a major physicians' group, Long Island Vitreo Retinal Consultants, had been told that CDF lacked funding for Eylea.  As a result, the group was switching patients to Avastin.  Exhibit 10.  This change in prescribing behavior illustrated that Eylea, at its $1,850 per dose price point, could not compete effectively with Avastin, which cost $55 per dose, unless Regeneron relieved Eylea patients of their cost-sharing obligations.

97.     Less than one week after learning of CDF's lack of funding for Eylea, on or about January 15, 2014, Regeneron donated $12.75 million to CDF.

98.     After early 2014, with CDF and other patient assistance foundations coming under increased scrutiny, CDF and Regeneron became more circumspect in their written communications and patterns with respect to funding requests and payments.  However, by that time, Regeneron understood from CDF that CDF was using Regeneron's funding to ensure that

physicians did not need to consider the impact of Medicare cost-sharing contributions when deciding to purchase and prescribe Eylea.  On information and belief, Regeneron and CDF continued to coordinate by calculating the amount needed to cover Eylea patients' cost-sharing obligations, taking steps to ensure that Regeneron's funds were directed to Eylea patients rather than patients who used competing drugs, and ensuring that Regeneron's return on investment would be higher than its payments to CDF.

99.    CDF benefitted from the illegal scheme by retaining a portion of the funding it received from Regeneron as "administrative fees."

100.    Regeneron's illegal scheme directly and proximately damaged Plaintiff and Class members by causing them to make payments for Eylea, at increased prices, that they would not otherwise have made.

### 3.    Regeneron Induced Physicians to Prescribe Eylea and Facilitated Plaintiff and Class Members' Overpayments

101.    Among other factors, physicians consider the amount that a patient will need to pay for a given drug when deciding which drug to prescribe.  Physicians often prescribed Avastin for patients when they were aware that patients would need to bear the cost of Eylea.

102.    In order to minimize off-label Avastin prescriptions for patients who could have been treated with Eylea, Regeneron needed to promote the fact that relief for cost-sharing payments associated with Eylea was available through CDF.

103.    In or around 2012, Regeneron launched a program called "EYLEA4U."  Regeneron retained the Lash Group to help run the EYLEA4U program.  The Lash Group is a pharmaceutical industry consulting firm that is a subsidiary of AmerisourceBergen Corporation.  On information and belief, the Lash Group created, implemented, and operated the EYLEA4U program as alleged below, under Regeneron's supervision, direction, and control, and was paid to do so by Regeneron.

104.    The Lash Group advertised and promoted the EYLEA4U program to physicians who were in a position to prescribe Eylea to patients, touting the program as a way to help "meet the reimbursement and copay assistance needs of you and your patients."  Exhibit 11.  The program sought to assure physicians that if they prescribed Eylea, EYLEA4U would facilitate coverage of their patients' out-of-pocket costs.  In doing so, the program gave physicians an incentive to prescribe Eylea instead of the much-cheaper Avastin.

105.    The following is a typical EYLEA4U advertisement:



106.    EYLEA4U materials distributed by the Lash Group to physicians and patients misrepresented CDF as "an independent co-pay assistance foundation."  *Id.*

107.   EYLEA4U falsely claimed on websites and in promotional materials that "Regeneron does not influence or control the operations of patient assistance programs through independent charitable foundations."  Exhibit 12.

108.   The EYLEA4U program publicized these and similar misrepresentations to patients, physicians, and the public at large to conceal Regeneron's illegal kickback scheme with CDF.

109.   EYLEA4U also made efforts to connect patients using Eylea with CDF.  The program then worked with CDF to ensure that patients received the money that Regeneron had "donated" to the foundation.  With respect to Medicare patients that the EYLEA4U program connected with CDF, the program would follow up with CDF "until a decision [was] made on [the patient's] application, and would then "[l]et [the patient's] doctor's office know that [the patient] ha[d] applied and provide an update with the final decision."  Exhibit 13.

110.   Physicians submitted insurance information to the EYLEA4U program on behalf of their Eylea patients.  The EYLEA4U programp referred the majority of these patients to CDF.  Thus, the EYLEA4U program served as a pipeline to connect Eylea patients with CDF and worked directly with CDF to ensure that Eylea patients would receive the funds provided by Regeneron.

111.   CDF also communicated directly with physicians to provide assurances concerning the availability of coverage for patients if the physicians prescribed Eylea.  The EYLEA4U program facilitated such direct communications by disseminating CDF's contact information.

112.   Through advertisements, promotional materials, and direct communications, the EYLEA4U program provided assurances and funding that made Eylea financially more attractive than its competitor Avastin for patients and physicians.  The EYLEA4U program rendered Eylea less costly for the patient than Avastin, and in fact allowed patients to obtain Eylea free of cost.

113.    Regeneron's conduct, including its unlawful relationship with CDF, its promotion of available patient assistance funding, and its work to connect patients with CDF funds, induced physicians to prescribe, and patients to use, Eylea.

114.    In addition to promoting financial incentives to use Eylea, the EYLEA4U program facilitated the flow of money from healthcare plans for the payment of claims for Eylea prescriptions.

115.    The EYLEA4U program provided comprehensive "reimbursement support" for physicians who prescribed Eylea.  Physicians could access patients' healthcare benefits and provide the physician with a "thorough BI [benefits investigation]" that "summarizes your patient's coverage, PA [prior authorization] requirements, cost responsibility, and any additional coverage information."  *See* Exhibit 14.  EYLEA4U directly contacted payors to confirm that they would pay for Eylea-related claims.  After claims were submitted, EYLEA4U you would "[r]eview the status of an EYLEA claim with the patient's insurer," and would contact the payor to make sure the payor paid the claim.  *Id.*

116.    Through EYLEA4U's contacts with healthcare plans, Regeneron was aware of the cost-sharing requirements and other contractual provisions under which Plaintiff and Class members covered patients' healthcare costs.  Consequently, Regeneron's interference with those provisions through its illegal kickback scheme was knowing and intentional.

117.    The EYLEA4U program used the interstate wires and mail in a continuous nationwide campaign to disseminate, promote, and communicate the misrepresentations, and engage in the contacts, alleged above.

118.    The EYLEA4U program helped Regeneron increase Eylea's market share while maintaining the drug's exorbitant market price.

### 4.     Regeneron Actively Concealed its Scheme

119.     Regeneron executives received repeated warnings that the company's scheme would violate the law.

120.     As early as August 2011, Cynthia Sherman warned Regeneron executives that the company could not legally obtain CDF's "actual utilization data" or a "breakdown" of how much CDF spent on Eylea patients and could not legally "designate [Regeneron's] donations specifically" for Eylea.  *See* Exhibit 15.  Sherman testified in the DOJ Action that the executives rejected her warnings.

121.     After the October 2012 meeting in which Daniels reported that CDF was funding 6,200 Eylea patient contributions, Davis cautioned that Regeneron should not be receiving or relying upon Eylea-specific data from CDF.

122.     On December 5, 2012, Daniels sent Krukowski a copy of the Bulletin, in which HHS-OIG advised that, notwithstanding the facial applicability of the Anti-Kickback Statute to payments by pharmaceutical manufacturers to patients via foundations, "pharmaceutical manufacturers can donate to bona fide independent charity [patient access programs] ***provided appropriate safeguards exist***."  *Id.* at 70625 (emphasis assed).  The bulletin described these "safeguards," including that a foundation "must not function as a conduit for payments by the pharmaceutical manufacturer to patients," and that a pharmaceutical manufacturer should not "solicit or receive data from the charity that would facilitate the manufacturer in correlating the amount or frequency of its donations with the number of subsidized prescriptions for its products." *Id.* at 70626, 70627.

123.     Regeneron executives' repeated lies to company auditors further demonstrate Regeneron's knowledge that it should not be using Eylea-specific data from CDF.

124.     In February 2013, Regeneron's Vice President of Internal Audit, John Calabro, was in the process of conducting an audit, along with Regeneron's Manager of Internal Audit, Thibaux Corbin de Manhoux, focusing on Regeneron's financial assistance program for patients with commercial insurance.  In connection with this audit, the audit team inquired into Regeneron's relationship with CDF.  When February 20, 2013, Corbin asked Daniels to "provide . . . detail around the rationale for the amount paid" and "feedback reports . . .on how money given by Regeneron is actually being spent," Daniels forwarded the request to Krukowski, stating:

**From:** William Daniels
**Sent:** Friday, February 22, 2013 11:00 AM
**To:** Robert Davis
**Cc:** Robert Krukowski
**Subject:** FW: Co-pay referrals to non-profit organizations - Follow Up Questions

Bob,
Please see below. I am not really comfortable providing the documentation he is requesting. I wanted to know your thoughts.

125.     On February 23, 2013, Regeneron's commercial chief Robert Terifay responded to Calabro, including in his email that "[p]harmaceutical companies cannot provide reimbursement assistance of any kind to patients covered in any way by a government insurance program," and that, when pharmaceutical companies support foundations like CDF, "[d]onors have no rights to information of any sort on disposition of funds."  Exhibit 16.  Terifay further stated that: "We cannot ask for any information from the CDF.  We gave a charitable donation."  *Id*.

126.     Terifay's email to Calabro also forwarded Daniels' prior email, except that it had been modified to suggest Daniels was not comfortable ***requesting information from CDF*** rather than ***providing information to the auditors***.  *See id*.

28

From: William Daniels
Sent: Friday, February 22, 2013 11:00 AM
To: Robert Davis
Cc: Robert Krukowski
Subject: FW: Co-pay referrals to non-profit organizations - Follow Up Questions

Bob,
Please see below. I am not really comfortable asking for the documentation he is requesting. I wanted to know your thoughts.

127.    On information and belief, knowing that Regeneron should not be receiving Eylea-specific data from CDF, Terifay altered Daniels' email to create the impression that Daniels had not already received the illicit data.

128.    In November 2013, following negative media reports concerning CDF, the Regeneron internal audit team revisited the same issue, and Terifay–this time collaborating with Davis, Krukowski, and Daniels–deceived the audit team again.

129.    On Friday, November 22, 2013, the auditors met with Davis, Krukowski, and others.  The following Monday, November 25, 2013, Calabro sent an e-mail to the meeting participants seeking to confirm, among other things, that Daniels "has not had any conversations with CDF concerning product level data."  Calabro also asked for "a copy . . . of the monthly report of aggregate data we receive from CDF."  Krukowski then forwarded Calabro's e-mail to Daniels. Exhibit 17.  Calabro's e-mail shows further evidence of deceit.  Calabro apparently understood from the meeting that Daniels had not been having "conversations with CDF concerning product level data," even though the others who attended the meeting knew that Daniels had been having such conversations."  Calabro also apparently understood from the meeting that the full extent of CDF's data-sharing with Regeneron was a "monthly report of aggregate data" for CDF's entire AMD fund.  Such reports would not have provided drug-specific data and consequently would not have been useful to Regeneron in figuring out the amounts Regeneron would need to pay CDF to fund Eylea patients' cost-sharing contributions.  Regeneron had received only one such aggregate

report, in February 2012, and had not received any monthly reports of aggregate data from CDF in the following 20 months.  Instead, as the members of the commercial team knew, CDF had been supporting its funding requests to Regeneron with spreadsheets showing the number of Eylea patients in the AMD fund and the amounts CDF needed to cover the Medicare co-pays just for those Eylea patients.

130.    In furtherance of this deception, Daniels requested that Walley provide him with a copy of "the monthly CDF activity report," which included only aggregate data.  Exhibit 18. Daniels then forwarded this aggregate report to Calabro, suggesting that this type of aggregate data was the information he typically received, despite the fact that Daniels repeatedly received and relied upon Eylea-specific data from CDF.

## V.    PLAINTIFF'S AND THE CLASS'S DAMAGES

131.    To date, UFCW Local 464A has paid thousands of dollars in payments and reimbursements for Eylea.

132.    On information and belief, Regeneron's scheme caused the vast majority of these payments to be made, which would not have been made absent Regeneron's scheme.

133.    Before Regeneron and its co-conspirators circumvented Plaintiff's health benefit plan structure, UCFW Local 464's members were heavily incentivized to choose Avastin over Eylea for treatment of wet AMD.  All of UFCW Local 464A's payments and reimbursements were therefore caused directly by Regeneron's scheme.

134.    Plaintiff and Class members are entitled to damages in the amount of payments they made where Regeneron, either directly or through CDF or another third party, paid their members' cost-sharing obligations as part of Regeneron's unlawful scheme.

135.    Regeneron concealed and misrepresented its illegal arrangement with CDF until it was disclosed by the DOJ Action in 2020.  Without further disclosures, Plaintiff is unable to determine the full scope of the damages to itself and the Class caused by Regeneron's misconduct.

## VI.    TOLLING

136.    To the extent any limitations period might apply to the causes of action Plaintiff has against Regeneron, those periods have not run or started to run because Regeneron has engaged in continuing, repetitive, tortious conduct that has not ceased, causing additional and ongoing injury to Plaintiff.

137.    Even if one or more limitations period could apply, they would be tolled by virtue of the discovery rule.  Plaintiff only learned of Regeneron's conduct on or about June 24, 2020, when the Department of Justice filed suit against Regeneron.  Due to Regeneron's concealment of its scheme, Plaintiff could not have discovered the scheme earlier.  Indeed, the very purpose of Plaintiff using CDF as a conduit through which to pay the cost-sharing obligations of Eylea patients was to conceal its unlawful actions.

## VII.    CLASS ACTION ALLEGATIONS

138.    Plaintiff brings this action as a class action under Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of itself and on behalf of all others similarly situated (the "Class"), defined as follows:

> All health insurance companies and health benefit plan sponsors who indirectly purchased, paid, and/or provided reimbursement for some or all of the purchase price of Eylea (aflibercept), other than for resale, in the United States, its territories, and commonwealths at any time during the period from January 1, 2012 through and until the Present (the "Class Period").

139.    Excluded from the Class are:

a.   Regeneron and its counsel, officers, directors, management, employees, subsidiaries, and affiliates;

b.   all federal governmental entities;

c.   all persons or entities who purchased Eylea for purposes of resale or directly from Regeneron or its affiliates;

d.   all natural persons; and

e.   all pharmacy benefit managers.

140.   Members of the Class are so numerous and widely geographically dispersed throughout the United States and its territories that joinder is impracticable.  Plaintiff believes that there are hundreds of members of the Class, in an amount to be determined in discovery and at trial.  Further, the identities of Class members will be readily ascertainable through business records kept in regular order.

141.   Plaintiff's claims are typical of the claims of members of the Class.  Plaintiff and all members of the Class were damaged by the same wrongful conduct by Regeneron.

142.   Plaintiff will fairly and adequately protect and represent the interests of the Class.

143.   Plaintiff will fairly and adequately protect and represent the interests of the Class. Plaintiff's interests are coincident with, and not antagonistic to, the Class.

144.   Plaintiff is represented by counsel who are experienced and competent in the prosecution of class action litigation, and who have particular experience with class action litigation involving the pharmaceutical industry.

145.   Questions of law and fact common to the Class include, but are not limited to:

a.   whether Regeneron unlawfully distorted the cost of Eylea in the eyes of patients and prescribers;

b.  whether Regeneron increased the costs borne by health insurance companies and health benefit plan sponsors including Plaintiff and Class members;

c.  whether Regeneron paid illegal kickbacks to patients through CDF;

d.  whether Regeneron violated the federal Anti-Kickback Statute;

e.  whether Regeneron misrepresented and concealed material facts concerning its illegal arrangement with CDF;

f.  whether Regeneron violated the Racketeer Influenced and Corrupt Organizations Act;

g.  whether Regeneron violated state consumer protection laws and/or unfair and deceptive trade practices laws;

h.  whether Regeneron intentionally and tortiously interfered with the cost-sharing provisions in Plaintiff's and Class members' contracts thus causing Plaintiff and Class members to breach their agreements by failing to pay the cost-sharing obligations set forth in their healthcare plans; and

i.  whether Regeneron was unjustly enriched.

146.   Questions of law and fact common to members of the Class predominate over questions, if any, that may affect only individual Class members, because Defendants have acted on grounds generally applicable to the entire Class.  Such generally applicable conduct is inherent in Defendant's wrongful conduct.

147.   Class action treatment is a superior method for the fair and efficient adjudication of this controversy.  Among other things, class treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual

actions would engender.  The benefits of proceeding through the class mechanism, including

providing injured persons or entities with a method for obtaining redress on claims that might not

be practicable to pursue individually, substantially outweigh any difficulties that may arise in the

management of this class action.

148.    Plaintiff knows of no difficulty to be encountered in the maintenance of this action

that would preclude its maintenance as a class action.

## VIII.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### VIOLATION OF CIVIL RICO, 18 U.S.C. § 1962(C)

149.    Plaintiff incorporates by reference all of the allegations above as though fully set

forth herein.

150.    18 U.S.C. § 1962(c) makes it "unlawful for any person employed by or associated

with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to

conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a

pattern of racketeering activity."

151.    Regeneron and its co-conspirators are "persons" within the meaning of 18 U.S.C.

§ 1961(3) who conducted the affairs of an enterprise through a pattern of racketeering activity in

violation of 18 U.S.C. § 1962(c).

152.    Under 18 U.S.C. § 1961(4), a RICO "enterprise" may be an association-in-fact that,

although it has no formal legal structure, has (i) a common purpose, (ii) relationships among those

associated with the enterprise, and (iii) longevity sufficient to pursue the enterprise's purpose.

153.    Regeneron entered into an association-in-fact enterprise (the "Enterprise") within

the meaning of 18 U.S.C. § 1961(4) with CDF and the Lash Group.  The Enterprise was an ongoing

organization that functioned as a continuing unit for the purpose of fraudulently inflating the price and increasing sales of Eylea.

154.    Regeneron funneled illegal payments to CDF earmarked to eliminate cost-sharing obligations for Eylea patients.  Regeneron also enlisted the Lash Group to advertise the availability of the funds, to facilitate CDF funding for Eylea patients, and to monitor and facilitate reimbursements for Eylea from payors such as Plaintiff.  The Enterprise worked to deceive payors like Plaintiff into reimbursing claims for Eylea tainted by illegal kickbacks by means of fraud perpetrated over the wires or by mail.

155.    Regeneron, CDF, and the Lash Group are each "persons" distinct from the Enterprise.  Regeneron and each co-conspirator knowingly participated in the Enterprise and carried out their respective roles in furtherance of the Enterprise.  Each co-conspirator had the common purpose of conducting, and actually did conduct, a pattern of racketeering activity through the Enterprise.  Regeneron marketed Eylea and made illegal "donations" to CDF.  CDF routed Regeneron's "donations" to Eylea patients, eliminating their cost-sharing burdens.  The Lash Group marketed the funding to patients and prescribers and facilitated payments from payors.

156.    Each participant in the Enterprise knew that the scheme violated federal and state law as discussed herein.

157.    Regeneron established the Enterprise to increase its sales of Eylea and increase Eylea's market share while maintaining Eylea's price despite competition from lower-cost alternatives.  The Enterprise fraudulently used interstate wires and mail to conceal and misrepresent the illegal aspects of the scheme, thereby causing Plaintiff and other payors to pay tainted claims that they would not have paid absent the fraud.

158.     Each participant in the Enterprise played a distinct and essential role in conducting a pattern of racketeering activity through the Enterprise.  Regeneron marketed and sold Eylea and unlawfully coordinated its payments to CDF so that Regeneron's funds were used solely for the benefit of patients using Eylea as opposed to alternative drugs.  CDF provided Regeneron with the information needed to coordinate its funding, and served as the conduit for transmitting those funds to Eylea patients exclusively.  The Lash Group ensured through the EYLEA4U program that physicians and patients were aware of and able to utilize those funds and facilitated payments from Plaintiff and other payors to cover Eylea's costs.

159.     Plaintiff and Class members are "persons" as defined in 18 U.S.C. §§ 1961(3) and 1964(c) who have been financially injured as a result of Defendant's unlawful conduct in the form of payments they would not otherwise have made for Eylea and assert this count for relief pursuant to 18 U.S.C. § 1964(c).

160.     Regeneron exercised control over the Enterprise by planning, organizing, and funding the sham charitable donations to CDF, which were intended for use exclusively in connection with Eylea copays, and by retaining the Lash Group to promote the scheme.

161.     During the Class Period, the Enterprise's unlawful conduct and lawful practices were carried out by an array of employees, working across state boundaries, including from corporate headquarters in Tarrytown, New York (Regeneron), Frisco, Texas (CDF), and Fort Mill, South Carolina (Lash Group).

162.     Each participant in the Enterprise profited from the Enterprise's illegal activity. Regeneron enjoyed profits from the inflated price and increased sales of Eylea.  CDF retained a portion of Regeneron's payments.  The Lash Group obtained payments from Regeneron in connection with the EYLEA4U program.

163.    The Enterprise could not have succeeded, and its members could not have enjoyed the substantial financial benefits described above, absent their coordinated efforts.  The members of the Enterprise functioned as a unit with a common purpose.

164.    The relationships between Regeneron, CDF, and the Lash Group extended beyond the unlawful predicate acts at issue in this case.  For example, as discussed above, Regeneron's relationship with CDF predated the scheme at issue in this litigation.  The Lash Group operates other, lawful aspects of the EYLEA4U program, such as Regeneron's free drug program for uninsured patients.  The formal contracts and informal agreements between the members of the Enterprise do not overlap perfectly with its racketeering activities.  The illegal scheme at issue in this litigation was and is distinct from any legitimate business activities undertaken by Regeneron, CDF, and the Lash Group.

165.    The Enterprise engaged in and affected interstate commerce because it marketed Eylea throughout the United States, caused Eylea to be prescribed thousands of times, affected Eylea's pricing, subsidized Eylea's sales, and facilitated payments for Eylea from Plaintiff and Class members.

166.    Regeneron operated and controlled the Enterprise as a conduit for improperly funding payments to cover patients' out-of-pocket expenses and establishing the EYLEA4U program to further the scheme.

167.    Regeneron's predicate acts included at least the following: use of the interstate wires and mail to (a) distribute or facilitate the distribution of false advertising and promotional materials in support of Regeneron's illegal kickback program; (b) transmit or facilitate transmission of physicians' (unwittingly) false certifications and claims to Plaintiff and Class members; (c) distribute or facilitate the distribution of false advertising and promotional claims

denying that Regeneron exercised any influence or control over CDF's payments to Eylea patients; and (d) transmit other communications that fraudulently concealed and misrepresented the illegal nature of the Enterprise.

168.     Regeneron's predicate acts also include illegal kickbacks to patients when it funded and facilitated payments to Eylea patients on Medicare to cover those patients' cost-sharing obligations in connection with their Eylea purchases.  Regeneron committed violations of the Anti-Kickback Statute, 42 U.S.C. §§ 1320a-7b(b)(1) and 1320a-7b(b)(2), through its use of interstate facilities including wires to facilitate these payments and conduct communications regarding these payments, and consequently these kickbacks constitute bribery in violation of the Travel Act, 18 U.S.C. § 1952(b)(2).

169.     These acts constitute a sustained pattern of racketeering activity.  The racketeering activity began in 2012 and continued until at least 2020.  To this day, Regeneron's entire financial condition depends crucially on sales of Eylea, its top-selling product.  Consequently, Regeneron retains an overwhelming interest in perpetuating its illegal scheme and poses a threat of continued racketeering activity.

170.     The effect of Regeneron and its co-conspirators' racketeering activity was to induce sales of Eylea that otherwise would not have been made in the absence of the illegal conduct and to allow Regeneron to maintain an exorbitant price for Eylea.  Plaintiff and Class members suffered injuries when they made payments and reimbursements for claims for Eylea prescriptions, despite the availability of more cost-effective treatments for wet AMD.  Plaintiff and Class members' injuries were directly and proximately caused by Regeneron and its co-conspirators' racketeering activities.

171.     As described above, the Enterprise caused this result by (1) contributing illegal funds to Eylea patients to induce sales and to subvert the cost-sharing obligations imposed by health benefit plans; (2) inducing physicians to prescribe and patients to purchase Eylea by advertising the ability to receive a payment to cover the patient cost-sharing obligation; (3) inducing physicians and patients to apply to receive funding from CDF and facilitating the payment process; and (4) facilitating claims for Eylea treatment from physicians to payors like Plaintiff and Class Members.

172.     These actions reflect a continuous pattern of racketeering activity, and the threat that the racketeering activity could continue.

173.     Regeneron's overt and predicate acts in violation of 18 U.S.C. 1962(d) directly and proximately caused Plaintiff and Class members to suffer injury in their business and property, as described above.

174.     Plaintiff and Class members are entitled to recover three times the damages they have incurred, in an amount to be determined at trial, plus the costs of bringing this suit, including reasonable attorneys' fees.

## SECOND CLAIM FOR RELIEF
## CONSPIRACY TO VIOLATE CIVIL RICO, 18 U.S.C. § 1962(d)

175.     Plaintiff incorporates by reference all of the allegations above as though fully set forth herein.

176.     18 U.S.C. § 1962(d) provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b) or (c) of this section."

177.     Regeneron has violated 18 U.S.C. § 1962(d) by conspiring with CDF and the Lash Group to violate 18 U.S.C. § 1962(c).  The object of their conspiracy has been to conduct, or

participate directly or indirectly in the conduct of, the affairs of the Enterprise through a pattern of racketeering activity.

178.    As set forth in detail above, Regeneron has engaged in numerous overt and predicate unlawful and fraudulent acts, constituting patterns of racketeering activity, in furtherance of the conspiracy.  Regeneron intended to engage in the scheme resulting in Plaintiff and Class members paying claims for a higher volume of Eylea prescriptions than would have otherwise been prescribed, at inflated prices.

179.    The nature of those acts in furtherance of the conspiracy establishes that Regeneron, CDF, and the Lash Group not only conspired to violate 18 U.S.C. § 1962(c) and thus violated 18 U.S.C. § 1962(d), but also that they were aware that their course of conduct constituted a pattern of racketeering activity.

180.    Regeneron engaged in the commission of overt acts in furtherance of the Enterprise schemes, including the following racketeering predicate acts (as outlined in detail above):

      (a)  Multiple instances of unlawful kickbacks in violation of 18 U.S.C. § 1952;

      (b)  Multiple instances of mail fraud in violation of 18 U.S.C. § 1341; and

      (c)  Multiple instances of wire fraud in violation of 18 U.S.C. § 1343.

181.    The alleged conspiracy, and the overt, predicate acts committed in furtherance of the conspiracy, had the purpose and effect of causing Plaintiff and Class members to pay claims for Eylea that they would not have paid if they had been aware of the conspiracy and its effect on identifiable claims.  Plaintiff and Class members suffered injury to their business or property as a direct and proximate result.

182.     Plaintiff and Class members are entitled to recover three times the damages they have incurred, in an amount to be determined at trial, plus the costs of bringing this suit, including reasonable attorneys' fees.

### THIRD CLAIM FOR RELIEF
### UNFAIR AND DECEPTIVE PRACTICES UNDER STATE LAWS

183.     Plaintiff incorporates by reference all of the allegations above as though fully set forth herein.

184.     Regeneron engaged in unfair competition, and/or unfair/unconscionable, and/or deceptive acts or practices in violation of the state consumer protection statutes listed below.  As a direct and proximate result of Defendant's anticompetitive, deceptive, unfair, and/or unconscionable acts or practices, Plaintiff and Class members paid claims for a higher volume of Eylea prescriptions, at higher prices, than they would have paid absent Regeneron's unlawful conduct:

   a.   Alaska stat. §§ 45.50.471, *et seq.*, with respect to purchases of Eylea in Alaska;

   b.   Ariz. Code §§ 44-1522, *et seq.*, with respect to purchases of Eylea in Arizona;

   c.   Ark. Code §§ 4-88.-101, *et seq.*, with respect to purchases of Eylea in Arkansas;

   d.   Cal. Bus. & Prof. Code §§ 17200, *et seq.*, with respect to purchases of Eylea in California;

   e.   Colo. Rev. Stat § 6-1-105, *et seq.*, with respect to purchases of Eylea in Colorado;

   f.   Conn. Gen. Stat. § 6-1-105, *et seq.*, with respect to purchases of Eylea in Connecticut;

g.   Del. Code Ann. Tit. 6 §§ 2511, *et seq.* with respect to purchases of Eylea in Delaware;

h.   D.C. Code §§ 28-3901, *et seq.*, with respect to the purchases of Eylea in the District of Columbia;

i.   Fla. Stat. §§ 501.201, *et seq.*, with respect to purchases of Eylea in Florida;

j.   Haw. Rev. Stat. Ann. §§ 480-1, *et seq.*,with respect to purchases of Eylea in Hawaii;

k.   Idaho Code §§ 48-601, *et seq.* with respect to purchases of Eylea in Idaho;

l.   815 ILCS §§ 505/1, *et seq.*, with respect to purchases of Eylea in Illinois;

m.   Ind. Code §§ 24-5-0.5-1, *et seq.*, with respect to purchases of Eylea in Indiana;

n.   Iowa Code §§ 714.16, *et seq.*, with respect to purchases of Eylea in Iowa;

o.   Kan. Stat. §§ 50-623, *et seq.*, with respect to purchases of Eylea in Kansas;

p.   Ky. Rev. Stat §§ 367.110, *et seq.*, with respect to purchases of Eylea in Kentucky;

q.   La. Rev. Stat Ann. §§ 51:1 401, *et seq.*, with respect to the purchases of Eylea in Louisiana;

r.   Md. Com. Law Code § 13-101, *et seq.*, with respect to purchases of Eylea in Maryland;

s.   Mich. Stat §§ 445.901, *et seq.*, with respect to purchases of Eylea in Michigan;

t.   Minn. Stat. §§ 325D.43, *et seq.*,  325F.69, *et seq.* and 8.31, *et seq.*, with respect to purchases of Eylea in Minnesota;

u.   Missouri Stat §§ 407.010, *et seq*., with respect to purchases of Eylea in Missouri;

v.   Mont. Code Ann. §§ 20-13-103, *et seq.*, with respect to purchases of Eylea in Montana;

w.  Neb. Rev. Stat. §§ 59-1601, *et seq*., with respect to purchases of Eylea in Nebraska;

x.   Nev. Rev. Stat. §§ 598.0903, *et seq*., with respect to purchases of Eylea in Nevada;

y.   N.H. Rev. Stat. §§ 358-A:1, *et seq*., with respect to purchases of Eylea in New Hampshire;

z.   N.J. Rev. Stat §§ 56:8-1, *et seq*., with respect to purchases of Eylea in New Jersey;

aa. N.M. Stat. §§ 57-12-1, *et seq*., with respect to purchases of Eylea in New Mexico;

bb. N.Y. Gen. Bus. Law §§ 349, *et seq*., with respect to purchases of Eylea in New York;

cc. N.C. Gen. Stat. §§ 75-1.1, *et seq*., with respect to purchases of Eylea in North Carolina;

dd. N.D. Cent. Code §§ 51-08.1, *et seq*., with respect to purchases of Eylea in North Dakota;

ee. Okla. Stat. tit. 15, §§ 751, *et seq*., with respect to purchases of Eylea in Oklahoma;

ff. Or. Rev. Stat. §§ 646.605, *et seq.*, with respect to purchases of Eylea in Oregon;

gg. 73 Pa. Stat. Ann. §§201-1, *et seq.*, with respect to purchases of Eylea in Pennsylvania;

hh. P.R. Laws Tit. 10, §§ 260, *et seq.*, with respect to purchases of Eylea in Puerto Rico;

ii. R.I. Gen. Laws §§ 6-13.1-1, *et seq.*, with respect to purchases of Eylea in Rhode Island;

jj. S.C. Stat. Ann. §§ 39-5-10, *et seq.*, for purchases of Eylea in South Carolina;

kk. S.D. Code Laws §§ 37-24-1, *et seq.*, with respect to purchases of Eylea in South Dakota;

ll. Tenn. Code §§ 47-18-101, *et seq.*, with respect to purchases of Eylea in Tennessee;

mm.  Utah Code §§ 13-11-1, *et seq.*, with respect to purchases of Eylea in Utah;

nn. 9 Vt. §§ 2451 , et seq., with respect to purchases of Eylea in Vermont;

oo. Va. Code Ann. §§ 59.1-196, *et seq.*, with respect to purchases of Eylea in Virginia;

pp. 12A V.I.C. §§101, *et seq.*, with respect to purchases of Eylea in the U.S. Virgin Islands;

qq. Wash. Rev. Code §§ 19.86.010, *et seq.*, with respect to purchases of Eylea in Washington;

rr. Wis. Stat. § 100.18; Wis. Stat. §§ 100.20, *et seq.*, with respect to purchases of Eylea in Wisconsin; and

ss.  Wyo. Stat. Ann. §§ 40-12-101, *et seq.*, with respect to purchases of Eylea in

Wyoming.[7]

185.    Regeneron's conduct was directed to and impacted Plaintiff and Class members

through the patients Plaintiff and Class members serve.

186.    Plaintiff paid and/or reimbursed for claims on Eylea treatment for members in

several of the foregoing states, including at least New Jersey, New York and Florida, due to

Regeneron's fraudulent conduct.

187.    Class members paid claims on Eylea treatment for members in the foregoing states

due to Regeneron's fraudulent scheme.

188.    Plaintiff and Class members relied on Regeneron's misrepresentations to their

detriment, which were material to their decision to pay for Eylea.

189.    Regeneron's conduct offends established public policy and the public interest, and

is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

190.    Plaintiff and Class members are therefore entitled to actual damages or damages

for each deception that occurred, punitive damages, and attorney's fees.

191.    Regeneron violated the state consumer protection statutes knowingly and willfully,

specifically targeting Plaintiff and Class members who paid claims for patients' Eylea

prescriptions.

192.    Regeneron's conduct described herein directly and proximately injured Plaintiff

and Class members in their business and property.  Their injury consists of making payments and

---

[7] Plaintiff reserves the right to amend this complaint to add claims under Ga. Stat. § 10-1-390, *et seq.*, with respect to purchases of Eylea in Georgia, 5 Me. Rev. Stat §§ 207, *et seq.*, with respect to the purchases of Eylea in Maine, Mass. Gen. Laws Ch. 93A, *et seq.*, with respect to purchases of Eylea in Massachusetts, Miss. Code. Ann. §§ 75-24-1, *et seq.*, with respect to purchases of Eylea in Mississippi and W.Va. Code §§ 46A-6-101, et seq., with respect to purchases of Eylea in West Virginia.

reimbursements for claims associated with Eylea prescriptions they otherwise would not have paid, and that these payments and reimbursements were made at unlawfully inflated prices.  This injury is of the type the state consumer protection statutes were designed to prevent.

193.    Plaintiff and Class members are entitled to recover the appropriate damages under each state's laws, in an amount to be determined at trial, and other acceptable relief permitted by law.

**FOURTH CLAIM FOR RELIEF**
**FRAUDULENT CONCEALMENT AND FRAUD**

194.    Plaintiff incorporates by reference all of the allegations above as though fully set forth herein.

195.    Regeneron's fraudulent scheme specifically targeted healthcare payors such as Plaintiff.  As alleged above, Regeneron has expressly acknowledged that its entire financial condition depends heavily on healthcare plans' and plan sponsors' payments for Eylea.

196.    As alleged above, Regeneron's EYLEA4U program monitored and facilitated the payment of claims by Plaintiff and Class members.   Regeneron and its agents regularly communicated with healthcare plans as part of that process.

197.    During those communications, Regeneron misrepresented and concealed material facts concerning its illegal arrangement with CDF, as alleged above.  Those facts included, among others: Regeneron and CDF illegally calibrated Regeneron's funding to match the needs of Eylea patients exclusively; as a result, CDF was not acting as an independent, bona fide charity but rather as a conduit for Regeneron's illegal kickbacks to patients for choosing Eylea over alternative, less expensive drugs; and absent this illegal arrangement, healthcare plans and plan sponsors such as Plaintiff would have paid for a lower volume of Eylea prescriptions, at potentially lower prices.

198.     Plaintiff was unaware of Regeneron's illegal scheme until June 2020, when the DOJ Action was filed.

199.     The facts misrepresented and concealed by Regeneron, including *inter alia*, that it was funding illegal kickbacks to patients through earmarked donations to CDF, were material to Plaintiff's and Class members' decision to pay for Eylea claims.  If Plaintiff had known those facts, it would have refused to pay for identifiable claims tainted by Regeneron's unlawful scheme.

200.     Regeneron knew that Plaintiff and Class members lacked such knowledge and that, as a result, Plaintiff and Class members paid claims for Eylea that they otherwise would not have paid.

201.     Regeneron understood that healthcare providers who submitted claims to Plaintiff's and Class members' plans on behalf of Eylea patients would certify that the claims were not tainted by illegal kickbacks.  Regeneron's scheme caused healthcare providers to submit, unwittingly, false certifications for patients whose cost-sharing obligations were unlawfully paid for by Regeneron through CDF.

202.     Regeneron knew that its relationship with CDF violated the federal Anti-Kickback Statute, rendering those certifications false.

203.     Regeneron further knew that Plaintiff and Class members lacked knowledge of the falsity of those certifications, and that Plaintiff and Class members would rely on the certifications in paying claims for Eylea.

204.     Plaintiff had no reason to suspect that Regeneron and CDF were engaged in an illegal kickback scheme.  Plaintiff reasonably believed that the relationship between Regeneron and CDF complied with legal requirements.

205.     Regeneron knew and intended that Plaintiff and Class members would rely on healthcare providers' false certifications, and Regeneron's misrepresentations and concealments of material facts concerning its relationship with CDF.  Plaintiff actually and reasonably relied on those false certifications, misrepresentations, and concealments.

206.     As a result of its reliance, Plaintiff paid claims for Eylea that should not have been paid under the healthcare plans it sponsors, and suffered thousands of dollars in damages, the amount of which is to be determined at trial.

207.     Plaintiff and Class members are entitled to compensatory and punitive damages, in amounts to be determined at trial.

## FIFTH CLAIM FOR RELIEF
## TORTIOUS INTERFERENCE WITH CONTRACT

208.     Plaintiff incorporates by reference all of the allegations above as though fully set forth herein.

209.     Plaintiff and Class members' healthcare plans require that covered patients personally bear cost-sharing obligations when obtaining prescription drugs including Eylea.

210.     Regeneron knew that Plaintiff and Class members required patient cost-sharing in connection with Eylea prescriptions.   Regeneron intentionally and tortiously interfered with Plaintiff and Class members' contracts with plan beneficiaries by using its illegal kickback scheme to render Eylea free for patients.  Regeneron's interference caused members of Plaintiff's and Class members' healthcare plans to breach their agreements by failing to pay the cost-sharing obligations set forth in their healthcare plans.

211.    Regeneron's interference resulted in Plaintiff and Class members making payments for Eylea that they otherwise would not have made.  Additionally, Regeneron's scheme improperly increased the demand for Eylea, allowing the drug to maintain its excessive price.

212.    Regeneron's interference and procurement of those contractual breaches was wrongful and without justification, and intended to benefit Regeneron financially at Plaintiff's and Class members' expense.

213.    The contractual breaches Regeneron caused have directly and proximately caused significant damages to Plaintiff and Class members in the form of payments made by Plaintiff and Class members that they would not have made if Plaintiff and Class members had known that identifiable claims were tainted by Regeneron's illegal scheme.

214.    Plaintiff and Class members are entitled to recover the actual damages suffered by them as a result of this tortious interference, punitive damages, and all costs in litigating this action including attorneys' fees.

**SIXTH CLAIM FOR RELIEF**
**UNJUST ENRICHMENT**

215.    Plaintiff incorporates by reference all of the allegations above as though fully set forth herein.

216.    Regeneron benefitted from and increased its profits by effecting a scheme which caused Plaintiff and Class members to make payments for Eylea that they otherwise would not have made.

217.    Regeneron has voluntarily and knowingly accepted and retained those benefits and has been unjustly enriched as a result, to Plaintiff's and Class members' unjust detriment.  It is inequitable and unjust for Regeneron to retain these monies, which were procured by fraudulent pretenses and representations.

218.    Plaintiff and Class members are entitled to recover the amount unjustly retained by Regeneron, plus interest on these amounts.

## IX.    DEMAND FOR JUDGMENT

WHEREFORE, Plaintiff, on its own behalf and on behalf of the proposed Class, prays for judgment against Regeneron and that this Court:

1.    Determine that this action may be maintained as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, direct that reasonable notice of this action, as provided by Rule 23(c)(2), be given to the Classes, and appoint Plaintiff as the named representative of the Classes;

2.    Award Plaintiff and the Class compensatory, treble, and punitive damages in an amount to be determined at trial, plus interest in accordance with law;

3.    Award Plaintiff and the Class their costs of suit, including reasonable attorneys' fees as provided by law;

4.    Award appropriate equitable and injunctive relief; and.

5.    Award such other and further relief as the Court deems just and proper.

## X.    JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff, on behalf of itself and the proposed Class, demands a trial by jury on all issues so triable.


Dated: June 17, 2022

*/s/ **Kristen A. Johnson***
Thomas M. Sobol (BBO# 471770)
Kristen A. Johnson (BBO# 6677261)
Kristie A. LaSalle (BBO #692891)
**HAGENS BERMAN SOBOL
SHAPIRO LLP**
55 Cambridge Parkway, Suite 301

Cambridge, MA 02142
Tel: (617) 482-3700
Fax: (617) 482-3003
tom@hbsslaw.com
kristiel@hbsslaw.com

Joseph H. Meltzer
Terence S. Ziegler
Lisa Lamb Port
**KESSLER TOPAZ**
**MELTZER & CHECK, LLP**
280 King of Prussia Road
Radnor, PA 19087
Tel: (610) 667-7706
Fax: (610) 667-7056
jmeltzer@ktmc.com
tziegler@ktmc.com
lport@ktmc.com

John Radice
**RADICE LAW FIRM**
475 Wall Street
Princeton, NJ 08540
Tel: (646) 245-8502
Fax: (609) 385-0745
jradice@radicelawfirm.com

*Counsel for Plaintiff and the Proposed*
*Class*